E-FILED
Monday, 10 January, 2005  05:20:59 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA/DANVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| vs. | Crim. No. 04-20033-001 |
| LARRY D. BELL | |
| Defendant. | |

**SENTENCING COMMENTARY AND OBJECTIONS**

Now comes the Defendant, LARRY D. BELL, by this attorneys, RICHARD PARSONS, Federal Defender for the Central District of Illinois and TIFFANI D. JOHNSON, Assistant Federal Defender for the Central District of Illinois, and, pursuant to Local Rule 32.1 of the United States District Court for the Central District of Illinois, respectfully submits the following commentary and objections to the amended presentence report (PSR). In summary, the defendant argues that *Blakely v. Washington* applies to the federal Sentencing Guidelines and that the provisions of the guidelines made unconstitutional by *Blakely* are severable. If the Court agrees with the Defendant's objections, his base/adjusted offense level would be reduced by 16-levels, resulting in a total offense level 15, criminal history category of VI, and his guideline range would be 41 to 51 months.

**I.     All upward departures or enhancements that are not supported by facts to which the Defendant stipulated or that were not found by a jury cannot stand under *Blakely v. Washington* and *United States v. Booker***

This objection affects paragraphs 23, 24, 28, 29, 30, 33, and 68 (4B1.1 career offender offense level and criminal history). In *Blakely v. Washington*, __ U.S. __, 2004 U.S. LEXIS 4573 (June 24, 2004), the Supreme Court applied *Apprendi v. New Jersey*, 540 U.S. 466 (2000), to

determinant sentencing regimes, such as those found in the United States Sentencing Guidelines. Based on *Apprendi*, the Supreme Court held in *Blakely* that the defendant's sentence could not be enhanced based on a factor to which the defendant did not stipulate and that a jury did not find. *Blakely*, 2004 U.S. LEXIS 4573 at *5-18. The upward adjustments to which the Defendant objects in this case are based on facts obtained from sources other than a stipulation or jury verdict. Therefore, the Defendant objects to the PSR's determination that his sentence should be increased based on facts to which the Defendant did not stipulate and that a jury did not find.

1    In *Blakely*, the defendant pleaded guilty to second degree kidnaping involving domestic violence and use of a firearm. *Blakely*, 2004 U.S. LEXIS 4573 at *5. Second degree kidnaping was a class B felony subject to a statutory maximum sentence of no more than ten years. *Blakely*, 2004 U.S. LEXIS 4573 at *6. Under Washington's Sentencing Reform Act, given the defendant's criminal history, the second degree kidnaping involving a firearm was assigned a "standard range" sentencing range of 49 to 53 months imprisonment base on a beginning range of 13-17 months and a 6 month increase for the gun. *Blakely*, 2004 U.S. LEXIS 4573 at *6. Pursuant to the Act, the judge could depart upwards from the standard sentencing range. Based upon a finding of "deliberate cruelty" (one of the non-exclusive statutory aggravating factors), the sentencing judge imposed a 90 month exceptional sentence. *Blakely*, 2004 U.S. LEXIS 4573 at *7-9.

The State contended that there had been no violation of the rule of *Apprendi v. New Jersey*, 530 U.S. 466 (2000) because the relevant statutory maximum sentence was 10 years-the maximum that could not be exceeded, even by an "exceptional sentence." *Blakely*, 2004 U.S. Lexis 4573 at *13. The *Blakely* Court disagreed, finding that the standard range constituted the relevant statutory maximum.

In *Apprendi*, the Court had held:

> Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury.

*Blakely*, 2004 U.S. LEXIS 4573 at *10 (quoting *Apprendi*, 530 U.S. at 490). The *Blakely* Court noted that *Apprendi* was based upon "two longstanding tenets of common-law criminal jurisprudence," both of which emphasized what is legally essential to punishment in the context of jury trials. The Court stated tenets:

> that the "truth of every accusation" against a defendant "should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours," 4 W. Blackstone, Commentaries on the Laws of England 343 (1769), and that "an accusation which lacks any particular fact which the law makes essential to the punishment is . . . no accusation in reason," 1 J. Bishop, Criminal Procedure § 87, p. 55 (2d ed. 1872)

*Blakely*, 2004 U.S. LEXIS 4573 at *10-11.

The Court in *Blakely* pointedly explained that: "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. *Blakely*, 2004 U.S. LEXIS 4575 at *13-14 (emphasis in original). The Court explained further that: "In other words, the relevant 'statutory maximum' is not the maximum he may impose without any additional findings." *Blakely*, 204 U.S. LEXIS 4573 at *14 (emphasis in original). The Court concluded this specific analysis by stating: "When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his proper authority." *Blakely*, 2004 U.S LEXIS 4573 at *13-14 (emphasis in original) (*quoting* 1 J.Bishop, Criminal Procedure § 87, p. 55 (2d ed. 1872)).

2      While *Blakely* was decided based on Washington state law, the broadly worded opinion applies equally to federal sentencing law. In the State of Washington, the determinant sentencing

regime is based on statutory considerations, not, as in the federal sentencing regime, guidelines. Nevertheless, the United States Sentencing Guidelines have the force and effect of law. *Stinson v. United States*, 508 U.S. 36 (1993). The justices who dissented in *Blakely* acknowledged that the opinion would affect other determinant sentencing regimes, including the federal sentencing regime. *Blakely*, 2004 U.S. LEXIS 4573 at *17 n. 9 ("The consequences of today's decision will be a far reaching as they are disturbing. Washington's sentencing system is by no means unique. Numerous other States have enacted guideline systems, as has the Federal Government. Today's decision cast constitutional doubt over them all and , in so doing, threatens an untold number of criminal judgments.") (O'Conner, J., dissenting). Consequently, the facts that Washington's sentencing factors are statutory does not sufficiently distinguish them from the United States Sentencing Guidelines.

The *Blakely* case concerned what Washington State Law referred to as an exceptional sentence. In *Blakely*, the judge increased the standard sentencing range that was based on the offense and a gun enhancement because the judge found that the defendant committed the offense conduct with "deliberate cruelty." The exceptional sentence in Washington is practically indistinguishable from what is referred to under the United States Sentencing Guidelines as an upward departure. Because "exceptional sentences" and "upward departures" are practically indistinguishable, *Blakely* certainly applies to upward departures. *See United States v. Booker*, ___ F.3d ___, 2004 WL 1535858 (7th Cir. 2004)**.**

By its very terms, *Blakely* also applies to upward adjustments in the guidelines at least to the extend that they are not based on stipulation or a jury finding. *Blakely* prohibits the increase of a Defendant's sentence based on facts to which the Defendant did not stipulate or that were not found by a jury. Upward adjustments under he Sentencing Guidelines may be based on facts

from any number of different sources. However, under *Blakely*, the Supreme Court prohibits the use of any sources other than a stipulation from the Defendant or a jury verdict. The upward adjustments to which the Defendant objects in this case are based on facts obtained from sources other than a stipulation or jury verdict. Because the facts supporting these upward adjustments are from other sources, this Court may not apply them in this case. Therefore, under *Blakely* and *Booker*, this Court may not upward depart or apply the upward adjustments objected to in this case because they are based on facts to which the Defendant did not stipulate and that were not found by a jury.

II.     **The Sentencing Guidelines Must Continued to Be Applied with the Unconstitutional Provisions Severed**

At root, severability is a question of legislative intent. Courts ask whether Congress would have enacted a given statute at all, had it known that a court would rule one or more parts of the statute invalid. A split panel of the Ninth Circuit held that *Blakely* applies to the guidelines, but that the guidelines are severable. *United States v. Ameline*, No. 02-30326 slip op. at 27-33 (9th Cir. July 21, 2004) (2-1). The *Ameline* court also approved a sentencing jury. *Ameline*, No. 02-30326 slip op. at 33-36. *See also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999) (severability is "essentially an inquiry into legislative intent"); *Buckley v. Valeo*, 424 U.S. 1, 108-09 (1976) (per curiam); *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684-85 (1987). If the loss of one or more provisions does not completely undermine legislative intent, the balance of the statute stands, with the offending provision or provisions severed. If, on the other hand, the invalid provision by its absence so wrecks what the legislature planned that Congress would not have acted at all, the whole statute falls. In that event, the statute is non-severable and Congress goes back to the drawing board.

There are several good arguments in support of its conclusion that "the guidelines as a whole would no longer be applicable as binding authority" when *Blakely* would bar upward adjustments. The Defendant agrees that juries ought not decide facts that only the Sentencing Commission selected as bases for an increased sentence. *Booker* and *Blakely* in turn mean that the judge cannot apply those adjustments without jury findings, unless the defendant admits the facts that support a given upward adjustment. What then of the guidelines? With the jury excluded, a judge might set aside all upward adjustments not supported by a jury verdict or the defendant's admission and sentence upon what remains of the guidelines. Or the judge might decide that the restriction on using upward adjustments so distorts the guideline scheme that all guidelines fall, and the judge is left to his or her discretion within the statutory minimum and maximum terms.

As a purely practical matter, the argument that the guidelines are non-severable has great appeal. Surely the Sentencing Commission and Congress did not envision a guideline scheme in which sentencing ranges could go down from the base offense level, but often could not go up. The first judge to adopt the view that the guidelines are not severable was the Hon. Paul G. Cassell in *United States v. Croxford*, 2004 WL 1521560 (D. Utah July 7, 2004) (modified 2004 WL 1551564, July 12, 2004).

3      But *Croxford* and other courts have not considered a preliminary, and much more challenging, question. A federal court has two constructs before it: the Sentencing Reform Act of 1984; and the system of sentencing guidelines that the United States Sentencing Commission promulgated, and Congress approved, under that Act. To which construct does severability doctrine apply? That is, do courts apply severability analysis only to the guidelines promulgated by an independent judicial branch agency, *Mistretta v. United States*, 488 U.S. 361, 368 (1989),

under an authorizing legislative enactment; or do they raise their sights and apply severability analysis (either only or additionally) to the authorizing legislative enactment itself?

*C*ourts that have ruled the guidelines non-severable have assumed that severability doctrine addresses guidelines or regulations promulgated under an act of Congress. They have assumed that severability doctrine does not address only the act of Congress itself. But they have not explained or justified their assumption.

Deciding the correct level of application is important. If severability analysis descends to and addresses the guidelines, the range of possible outcomes is fairly limited. There are few nuances in deciding what Congress or the Sentencing Commission probably intended and the guidelines themselves are a discrete, integrated system. Non-severability is the more likely conclusion. But if the severability analysis instead addresses the authorizing enactment, the Sentencing Reform Act of 1984, Pub. L. 98-473, tit. II, ch. II (Oct. 12, 1984) (SRA or the Act which Congress incorporated into an appropriation bill), the range of considerations expands considerably.  The SRA was a comprehensive act that made many changes other than just establishing a Sentencing Commission and authorizing sentencing guidelines. The loss of just some of those guidelines in just some cases probably does not vitiate congressional intent as to the whole Act. Severability is the more likely conclusion.

On the other hand, if the SRA itself is non-severable then some unconsidered consequences, including relatively dramatic ones, follow. A few examples suffice. An immediate jurisdictional problem lies as to the review of any sentencing decision a court makes, because the SRA ordinarily provides the jurisdiction to consider appeals from sentences in the first place. 18 U.S.C. § 3742; SRA § 213(a). Parole may be re-established, because the SRA is all that repealed it.  SRA §§ 218(a)(5), 235(b)(1)(A). A court no longer may impose a term of supervised release,

for that is a creature of the SRA. 18 U.S.C. §§ 3583, 3624(e); SRA § 212(a)(2). And, without government motion or concurrence, a defendant presumably once again may seek modification of his sentence within 120 days after sentencing, for it was the SRA that amended former FED. R. CRIM. P. 35(b). SRA § 215(b).[1]

Establishing the United States Sentencing Commission and providing its authority to promulgate guidelines were important purposes of the SRA, of course. But a single subsection of the Act, SRA § 217(a), accomplished all of that. *See* 28 U.S.C. §§ 991-998.

Congress did not include a severability clause in the SRA. It said nothing at all about severability.

4     The defendant makes an initial observation about severability doctrine. Because the root question under severability analysis is legislative intent, the doctrine seems to presuppose legislation as the object of its application. Legislatures express intentions in legislation, and in the process that produces legislation.

The legislature does not write regulations under its enactments. That task it leaves to the executive branch. Congress for that reason cannot express its intent through regulations. It can express its intent only by the manner in which it authorizes implementing regulation. Indeed, Congress violates the separation of powers doctrine if it tries to reassert its will in the regulatory process by reserving the right of one chamber to overrule an executive branch choice under the authorizing enactment. *INS v. Chadha*, 462 U.S. 919, 957-58 (1983) (invalidating the one-house legislative veto of executive action; that is essentially legislative, so it requires bicameral passage

---

[1] The same appropriations bill that contained the SRA also established special assessments. But that provision, § 1405(a) of Pub. L. 98-473, was not part of Chapter II, Title II, the Sentencing Reform Act. Still special assessments are an integral part of sentencing. Conceivably, they too would not survive the fall of the entire SRA.

and presentment to the President).

Similarly, Congress does not write sentencing guidelines in the first instance. It authorized an independent agency in the judicial branch to do that. The role Congress retains is important, but passive: the Sentencing Commission's amendments to the guidelines take effect not earlier than 180 days after the Commission promulgates them, unless Congress modifies or rejects the amendments by Act. 28 U.S.C. § 994(p). True, with increasing frequency in recent years, Congress has insisted upon changes to the guidelines; consider as one example the PROTECT Act of 2003. But even then, Congress directs the Sentencing Commission in broad strokes to write a particular guideline amendment. It does not write the amendment itself.

So at least narrowly, neither individually nor collectively do the guidelines reflect legislative intent. They reflect the Sentencing Commission's intent in implementing the authority and directives Congress provided. While the Commission's work must be consistent with Congress's, just as an executive branch agency's regulations should be consistent with Congress's intent, still the promulgating body's purposes are one step removed from legislative intent. More, the promulgating agency's intent is irrelevant, strictly speaking. What is relevant is the implementing regulations' fidelity to congressional intent, as expressed in the statute's terms.

All of that suggests that severability analysis, concerned with legislative intent, does not bear on guidelines or regulations. It bears on legislation.

There are other good reasons, logically, to bring severability doctrine to bear only on legislation itself, rather than descending to implementing regulations or guidelines. Under our constitutional system, the legislature is the principal author of broad policy. Its elective offices make the legislature most responsive to public preferences. But, because the Framers also feared the legislature most as a source of tyranny (addressing it in Article I as a matter of priority, *see*

*generally* THE FEDERALIST No. 48 (James Madison) (Clinton Rossiter ed., 1961)), they also established a rigid, balanced and detailed process of enacting legislation. Both houses of Congress must approve a bill. The president must sign or veto it. U.S. CONST. art. I, § 7, cl. 2. And only a super-majority in Congress will override a presidential veto. U.S. CONST. art. I, § 7, cl. 2. Revenue-raising bills further must begin in the House of Representatives. U.S. CONST. art. I, § 7, cl. 1.

Executive branch regulation, by contrast, requires a less rigorous process. Yes, the Administrative Procedures Act usually requires public notice and opportunity for comment, 5 U.S.C. § 553, and those requirements bind the Sentencing Commission. 28 U.S.C. § 994(x). Still the regulatory process remains much more fluid than the legislative process.

It must be that way. Congress acts at a moment in time; agencies implement that legislation over time. For that reason, agencies frequently amend, modify or repeal regulations as shifting technological, demographic, political, economic, or other trends and conditions warrant. They repromulgate regulations easily, in most instances. When a court strikes down a particular regulation, then, there usually is no reason to doubt that the agency can amend or reconsider the troublesome provision and continue apace. Given this fluidity and ease of response, only rarely should there be any reason to question whether the loss of a single tree despoils the entire regulatory forest.

In this sense, the Sentencing Commission and its guidelines are no different than executive branch agencies and their regulations. The Commission in fact has amended and expanded the guidelines almost annually, sometimes more often, since their inception. It has tinkered as it has seen fit, both in response to congressional directives and on its own motion. In light of that capacity, there is little reason to fear that the loss of any particular guideline or

guidelines should call the whole into question.

5	The defendant would register no surprise, then, if severability doctrine applied only to congressional enactments, not to regulations that the executive branch promulgates or to guidelines that the judicial branch authors. In fact, almost all severability cases do concern legislation after a court invalidates one provision of a statute or another. However, the Supreme Court on rare occasion has applied severability analysis to regulatory schemes. Those cases — the defendant finds at most two — provide few tools for a coherent application of severability doctrine to sub-legislative writings of the executive or judicial branches, like regulations and guidelines. The two cases do not explain how to match the legislative intent inquiry of severability doctrine to the non-legislative work of an executive branch agency or the Sentencing Commission. The two cases do not even explain why a court should try to make that unlikely match.

In *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988), the Supreme Court struck down a United States Customs Service regulation permitting importation of some "gray-market" goods under an authorized-use exception. That regulation was inconsistent with § 526 of the Tariff Act of 1930, 19 U.S.C. § 1526. *K Mart*, 486 U.S. at 293-94.

The Court went on to hold that single regulatory exception "severable." *Id*. at 294. The Court's entire explanation of this ruling was:

> The severance and invalidation of this subsection will not impair the function of the  statute as a whole, and there is no indication that the regulation would not have been passed but for its inclusion.

*Id*. at 294.

That was not much. The Court did not explain why invalidation of one regulation ever would "impair the function" of a statute. Impairment seems unlikely, for an agency faces no bar

to promulgating a new regulation that serves the legislative intent and meets a court's objection.

The Court also did not explain its subtle shift from congressional intent on the function of the statute, to asking what the executive branch agency instead would have done absent inclusion of the invalid regulation. The second inquiry appears to introduce an element of *agency* intent, in addition to legislative intent. But the Court did not say why the agency's intent matters, if the issue in severability analysis is legislative intent.

Again, the agency's intent should not matter. Its job simply is to implement and enforce legislative intent. If the agency failed that task with a particular regulation, let it return to the process of promulgating a replacement that better serves.

The only case that the Supreme Court cited in applying severability analysis to a regulation, *Federal Reserve System Board of Governors v. Dimension Financial Corp.*, 474 U.S. 361 (1986), sheds little light on the cryptic *K Mart* discussion. The *Dimension Financial* Court nowhere expressly discussed severability at all. *Dimension Financial* struck down the Federal Reserve Board's definition of a "bank" as contrary to § 2(c) of the Bank Holding Company Act of 1956, 12 U.S.C. § 1841(c). Without comment, the Court apparently left intact other Federal Reserve Board regulations. At least the Court did not say that it did otherwise. *Dimension Financial*, 474 U.S. at 374-75.

That silence was not necessarily an implicit assertion that severability doctrine applies to regulations. Just as consistently, one can read *Dimension Financial* as suggesting tacitly that it does not; that there is no need to apply severability analysis to regulations. The Court well may have assumed, rationally, that a stricken regulation simply becomes inoperative alone, and that the agency is free to write a replacement that is consistent with legislative intent. The *Dimension Financial* Court may have entertained no thought at all that striking one regulation ever could

have the effect of felling the entire regulatory scheme in which that regulation stood. Nothing in *Dimension Financial* revealed that the Court considered severability one way or the other.

To the extent that *K Mart* and *Dimension Financial* offer any help at all, the two decisions suggest that federal courts routinely will view regulations as severable. Both cases treated an errant regulation as severable, with little or no explanation. To all appearances, the Court all but took severability for granted. The defendant has discovered no case in which the Supreme Court instead held a regulatory scheme non-severable.

Whether the Supreme Court perceived so or not, little discussion of regulatory severability was due. The process of promulgating regulations lends itself readily to revision, repeal, and restatement. Executive branch agencies necessarily are more nimble in responding this way to changed conditions and court decisions, for Congress has only to announce its intentions once; the executive must implement those intentions again and again. The world changes as time passes, even if legislative intent remains static.

6       With severability analysis properly pitched to the authorizing statute, not to the guidelines promulgated under that legislation, the ruling in *Blakely* should not threaten the severability of the Sentencing Reform Act. At most, *Blakely* affects when and how some guidelines (those that enhance sentences) may be applied in some cases. That decision does not invalidate outright any guideline: if the defendant admits the factual basis of the guideline, or a jury finds it beyond a reasonable doubt, the guideline continues to apply after *Blakely* and *Booker*.[2]

---

[2] There is a further, more obvious reason not to apply severability doctrine to the guidelines. The predicate of severability doctrine is missing: the Supreme Court and the lower federal courts have not struck down any guideline as unconstitutional, or struck down any guideline for other reasons.

Even if *Blakely* and *Booker* entirely invalidate some guidelines, though, they leave in place all of the primary legislative purposes of the SRA. A system of sentencing guidelines still fosters uniformity and reduction of unwarranted disparities as Congress wanted; at worst, those guidelines after *Blakely* produce less *severity* in sentencing, not less uniformity or more disparity. The Sentencing Commission still continues its work. The government still controls downward departures for substantial assistance, and sentence modifications under Rule 35. Likewise the government retains significant control over credit for acceptance of responsibility.

Most importantly, *Blakely* and *Booker* left entirely in place a determinate sentencing scheme as Congress intended, in which modest good time reductions of prison terms are fixed and predictable and discretionary early release by parole is abolished. Nothing in *Blakely* frustrates legislative intent by returning federal courts to indeterminate sentencing. Indeed, *Blakely's* effect on the SRA is limited largely to part of the Sentencing Commission's product under one subsection of the Act, § 217(a), which created 28 U.S.C. §§ 991-998, and to 18 U.S.C. § 3553. As to §§ 991-998, *Blakely* does not change the Sentencing Commission's functioning. At most it requires more work of the Commission, repromulgating guidelines under the procedures and rules that Congress established. As to § 3553, while *Blakely* requires substituting a jury as fact-finder for a judge when the defendant does not waive the jury's consideration, severing the term "court" as fact-finder surely does not assault Congress's broad intentions. *Accord United States v. Ameline*, No. 02-30326 slip op. at 29-33 (9th Cir. July 21, 2004).

---

Nothing in *Blakely* or *Booker* invalidates any guideline. Rather, both cases support the proposition that application of those guidelines remains valid, if a jury either finds the fact necessary to increase a guideline range or the defendant admits that fact. *Blakely* and *Booker* affect how and when courts may apply guidelines that provide sentence enhancements, then, but they do not make those guidelines unconstitutional or even practically inapplicable.

In sum, with the focus of severability doctrine on the statute, not on the guidelines, courts should conclude that any invalidated provisions of the Sentencing Reform Act are severable. Courts likely should reach the opposite conclusion if severability doctrine instead focuses lower, on the guidelines themselves. The choice of level at which a court applies severability doctrine probably determines the outcome of the analysis, in other words. The defendant concludes that the Court ought not declare the sentencing guidelines non-severable, because he doubts that severability doctrine properly applies to the guidelines at all. But if the Court disagrees, applies severability analysis first to the guidelines, and finds the guidelines themselves non-severable, it must consider the severability of the SRA, too. A conclusion that severability doctrine also applies to the guidelines does not avoid the more typical application of severability doctrine to the principal expression of legislative intent, the authorizing statute.

7    If the guidelines fall as non-severable, that decision in sequence leaves the SRA itself in new peril. It raises two nettlesome problems that may make the SRA non-severable after all. Just as the loss of many upward adjustments might distort the guideline scheme so badly that a court could set that entire scheme aside if it applies severability analysis to the sub-legislative guidelines, purely discretionary sentencing without the guidelines could distort the SRA greatly when a court considers severability of that Act.

Congress had three principal goals for the guidelines: "honesty, uniformity and proportionality." *United States v. Ameline*, No. 02-30326 slip op. at 29; *see also Mistretta*, 488 U.S. at 366 (Congress sought to reduce disparities in sentencing and to increase certainty in the amount of time an offender would serve); 28 U.S.C. § 991(b)(1)(B) (Sentencing Commission is to provide "certainty and fairness," avoid "unwarranted sentencing disparities," and maintain "sufficient flexibility to permit individualized sentences"). Under the indeterminate sentencing

scheme that preceded the guidelines, the Parole Commission served as a backstop to even out disparities and provide some individual consideration. Dissatisfied with a perceived lack of truth in sentencing and national uniformity, though, Congress enacted a determinate sentencing scheme that contemplated binding guidelines to route judicial discretion into narrow channels.

If the Act itself were non-severable, federal sentencing would be left in a new and strange form. That new form would carry two serious problems. First, it would create a system of discretionary sentencing with even greater potential for lack of uniformity and unwarranted disparities than the system Congress replaced with the SRA. Second, it would give federal courts two very different sentencing schemes, operating side-by-side: where the defendant waived *Blakely's* protections, as many do, the guidelines would apply just as they did before *Blakely;* but where the defendant did not admit all applicable upward adjustments or consent to judicial factfinding, there would be no binding guidelines and a court would have pure discretion within statutory minima and maxima. Those dual sentencing schemes would present a serious equal protection problem.

A. *Disparity*.

In cases that *Blakely* affects, a court might conclude, as the *Croxford* court did, that it is free to sentence the defendant anywhere within the floor and ceiling that Congress set by statute; often 0-20 years, 5-40 years, or so on. Since *Blakely*, courts and lawyers have called this indeterminate sentencing. It is not. Unless discretionary early release returns and the SRA's strict good-time limitations fall, it is *determinate* sentencing but without the limitations on discretion that the guidelines imposed. There is nothing indeterminate about it. Instead, a more accurate description would be discretionary determinate sentencing.

Such a makeshift determinate sentencing scheme, in which judges unconstrained by

guidelines imposed discretionary sentences within broad statutory ranges not subject to parole, hardly would promote uniformity or reduce disparities. It would magnify disparities and disuniformity, in comparison both to a determinate scheme with binding guidelines and to an indeterminate scheme with the leveling influence of a single national parole commission. If for no other reason, the magnification of disparities likely would follow from the *de facto* increase in actual maximum terms of incarceration that necessarily would result from using statutory maximum sentences without the mandatory release that parole formerly provided at two-thirds of the sentence imposed.

Proportionality might suffer, too, at least in a comparative sense. What seems proportional to one judge, or to judges in one region, might seem quite disproportional to other judges or to courts in other regions. And again, the leveling role of the Parole Commission, looking nationwide and making imprisonment adjustments at the back end, would be lost.

b. *Equal Protection*.

Sentencing some defendants under binding guidelines and others under no guidelines at all also would raise obvious equal protection concerns. The difference in treatment would turn not on some neutral factor, like when the defendant committed his crime,[3] but instead on the defendant's waiver of a measure of his rights under the Fifth and Sixth Amendments. Defendants who opted either for trial or for a guilty plea that did not include consent to judicial fact-finding

---

[3]For a time after November 1, 1987, the defendant appreciates, the nation also had a guideline scheme co-existing with a discretionary (there indeterminate) scheme of sentencing in federal courts. But all crimes committed after that date brought a guideline sentence, and all crimes committed before it brought a sentence under the old law. Like defendants were treated alike. The classification did not turn on what plea the defendant entered or on factors that might coerce a waiver of constitutional rights to a jury trial or to proof beyond a reasonable doubt. A classification that turned on a *Blakely* waiver would have both vices.

on upward adjustments, by a preponderance of the evidence, would face an entirely discretionary determinate sentencing scheme. Defendants who did waive these constitutional rights would face a binding-guideline determinate sentencing scheme. The type and length of sentence imposed often would turn — unpredictably at that — on the sentencing scheme that applied, and thus on the defendant's waiver or non-waiver of constitutional rights.

This equal protection problem never arises if the guidelines or the SRA are severable. All defendants face a guideline sentence.

8    The defendant thinks it unlikely, therefore, that Congress would have endorsed or tolerated a wholly discretionary but determinate sentencing scheme overlaid upon the broad statutory ranges of punishment. While such a scheme still would have served the goal of honesty in sentencing, it certainly would have exacerbated the disparities and lack of uniformity that primarily motivated Congress. It likely would have impaired the goal of proportionality, too. The *Croxford* approach removes the channeling effect of the guidelines on judicial discretion, while leaving in place the abolition of parole, which provided the best assurance of uniformity and proportionality across districts under the old system (albeit later during the corrections process, not during the judicial process at sentencing).

A Congress vitally concerned with reducing unfair disparities in sentencing and fostering uniformity and proportionality would not have taken those contradictory steps. Neither would a Congress interested in equal protection of the nation's laws. Non-severable guidelines also suggest a non-severable Sentencing Reform Act after *Blakely* and *Booker*, then.

If this Honorable Court continues to find that the guidelines are non-severable, it will confront a strong case for holding the entire Sentencing Reform Act is non-severable as well, not just the guidelines promulgated under that legislative enactment.

If the SRA itself is non-severable, then sentencing really does change dramatically. Determinate sentences are gone; parole is back. Supervised release is no more. A variety of other innovations under the SRA disappear. Sentencing appeals nearly disappear after two decades, with the usual appellate jurisdiction rolled back. The government once more shares Rule 35(b) with the defense. It is 1983 again.

### III.  Conclusion

The Defendant asks the Court to take the following steps. The Court alone can and should impose sentence, without a jury's involvement.  At sentencing the Court should use the base offense level, increased only by upward adjustments that rest entirely on a jury finding (explicit or implicit, if the Court concludes that the fact was a *sine qua non* of the guilty verdict) or on a defendant's admission, and decreased by any applicable downward adjustments or departures.

WHEREFORE, Defendant respectfully requests that this Court grant the Defendant's objections and sentence him based a total offense level 15, criminal history category of VI, and a guideline range of 41  to 51 months..

Please be advised that Mr. Larry Bell also would like to preserve an objection that *Blakely* applies to statutory maximum sentence increases, thereby reducing his maximum sentence from 30 years to 20 years.  The Supreme Court through *United States v. Harris,* 536 U.S. 545 (2002) and *McMillan v. Pennsylvania,* 477 U.S. 79 (1986) rejected a similar argument prior to *Blakely*. However, it is Mr. Bell's position that the *Blakely* decision contradicts these prior decisions and that the Supreme Court, therefore, must review these decisions in light of *Blakely*.

        RESPECTFULLY SUBMITTED,

        LARRY BELL, Defendant

        RICHARD H. PARSONS

        Federal Public Defender

        s/Tiffani D. Johnson
BY:_____
        TIFFANI D. JOHNSON, Bar No. 6278909
        Assistant Federal Defender
        300 West Main Street
        Urbana, Illinois 61802
        Phone: (217) 373-0666
        Fax: (217) 373-0667
        Email: tiffani_johnson@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to Assistant United States Attorney Richard Cox.

        s/Tiffani D. Johnson

        _____
        TIFFANI D. JOHNSON, Bar No. 6278909
        Assistant Federal Defender
        300 West Main Street
        Urbana, Illinois 61802
        Phone: (217) 373-0666
        Fax: (217) 373-0667
        Email: tiffani_johnson@fd.org

I:\Johnson\CLIENTS\Bell\sentcommentary.wpd